My name is Eric Cranium and I appear on behalf of the Plaintiff Appellant in this case, Erin Bulfin's case is unfortunate not just because it involves the loss of a beloved family pet at the hands of a state actor, but also because of the decisions that were made by the district court in this case on the motion for summary judgment. We allege three primary errors that the court made. First, the district court erred in granting summary judgment on its erroneous and improper finding that Mr. Ney consented to the euthanasia which tainted the remaining analyses. Second, the district court erred in its Fourth Amendment analysis. And third, the district court erred in granting qualified immunity to the individual defendants and subsequently dismissing the Monell claim. First, the district court erred in granting summary judgment based on Mr. Ney's what they considered consent. The issue of consent permeates both of the orders in this case, being mentioned a total of 36 times, with the order in reconsideration stating, quote, in particular, no reasonable jury would find an unreasonable seizure occurred because the evidence established there was consent for the seizure. However, the problem is that it's near axiomatic in this court, in the Supreme Court, that genuine disputes of predicate material facts defeat – You're going too fast for me. I'm sorry. My apologies, Your Honor. Defeat summary judgment if there is a dispute of predicate material facts. The court improperly resolved inference against Ms. Bolfin in this case by ignoring a significant number of disputes of these material facts related specifically to Mr. Ney's consent. Because the consent issue became the linchpin of the district court's orders, this error infected the entire ruling. The court found that there was no evidence that plaintiff herself, Ms. Bolfin, had ever requested that Daisy be euthanized. This, despite the fact that she spoke to – Wait. I thought it was undisputed that she said Mr. Ney is going to bring the dog in. It's undisputed that she said Mr. Ney was going to bring the dog in. The issue is what the purpose for bringing the dog in was. There's actually – there's actually a dispute between the parties amongst – about what the – She talked to Ms. Rainwater after the dog bit her daughter. Correct. Seriously. Correct. And her daughter was in for emergency surgery. She had to have some stitches, Your Honor, yes. And Ms. Rainwater explained, yes, the ordinance requires that the dog be brought in, and there are various things that might happen. And your client inquired specifically about euthanasia. So obviously recognized that that was on the table, so to speak, and then said, okay, he's going to bring the dog in. Now then – and the magistrate judge said, okay, then he brings the dog in, and he has – he voluntarily surrenders the dog. And the magistrate judge says, I understand it, but there's still a question of whether she has a lingering, if you will, possessory interest. And then the judge addressed that. How in the world is that a faulty analysis? Well, Your Honor, there is a dispute as to whether or not Ms. Balfin or her husband, Mr. Ney, consented to euthanasia. Being aware of the fact that euthanasia is something that's permitted by the ordinance doesn't mean that she's consenting to euthanize her dog. She's consenting to bring the dog in pursuant to the ordinance that requires that she do so in a bike case. In which she understood euthanasia was a possible result. Oh, absolutely, and that's why she spoke to her veterinarian about it. This is a sad case, and I'm not saying that it was handled perfectly, but I don't think you win on the consent question. Because specific consent to euthanasia, they didn't have to get on a phone or send out a squad car to get a signed authorization to take a step that was within the parameters of the consent form. With regard to... That's what it seems to me. It seems to me consent is not, initial consent is not the issue here. Well, there's a number of issues here. Number one is that we have some confusion with regard to whether consent to search is the same as consent to seize. Ostensibly, it's not. The Supreme Court and this Court have made very, very clear that the search clause and the seizure clause address two very different interests. The search clause implicates a privacy interest. You don't have any support for that argument. I wrote a cluttered case. I mean, that doesn't get anywhere to me. Obviously, you can have consent to search as well as a consent to seizure by a co-owner, co-tenant, co-whatever. And with regard to clutter and the other cases similar to it, Your Honor, one of the distinguishing factors, at least in the way that I read it, is that the courts have made it very, very clear that a consent to a search can result in a seizure, whether it be under the auspices of plain view or, for example, there is an exigent... What search was involved here? I'm sorry? Why are you talking about a search? What search was involved here? There's not... I think an argument can be made that bringing the dog in for quarantine is a search, but that's not really the point that we're making. Why would someone make that argument? That's not even the point that I'm making. But why are you talking about a search? In the district court, Your Honor, the judge invoked Matlock, which was a search case, specifically about consent to search, not about consent to seize. That's the only reason that I'm addressing the issue of search versus seizure. When I'm talking about this case, we've got a document here that the man signed authorizing irrevocably relinquishing ownership to the St. Louis County Animal Care and Control and stating that he understands the animal immediately becomes sole property of the AC&C for the purpose of euthanasia. Why could not a reasonable official believe that it was permissible then to seize the animal? One of the big issues around the form itself, Your Honor, is with regard to what the form contains, and it's something that the district court focused heavily on, saying that it says specifically that the animal can be euthanized. Upon a closer look at the document, however, there's three different areas that Mr. Ney signed, because he was instructed to. He didn't fill the document out himself. He just signed where he was told to. And each of those purport to do something entirely different with regard to the property or the dog in this situation. He signed them all. He did, and the problem is that they He surrendered whatever immediate interest there was in the dog under any of those forms. The issue there is that the, and St. Louis County admits this in their responsive pleading, is that those three boxes have different purposes. One is for a relinquishment for the purpose of a bite question. I understand what you're saying about the form, but I'll go back to my question if you want to address it, which is since the Fourth Amendment has to do with reasonableness, why couldn't a reasonable official believe that the man's signature on the portion that I read authorized them to seize and euthanize the dog? As with everything, reasonableness being the touchstone of the Fourth Amendment. Part of that comes down to the totality of the circumstances and looking at everything in its totality. The form itself, aside from the fact that there's competing areas that Mr. Ney supposedly signed over authorization or consent to, there's also the fact that the forms themselves, every box that he signed says, this dog has not bitten anybody in the last 10 days. That's because that form is not meant to, by its reading. That would be false, right? I'm sorry? That would be false. Absolutely false in the testimony and the depositions. And he knew it was false. I'm sorry? He knew it was false. So did the people at St. Louis County, Your Honor, who were the ones who filled it out. They didn't know it as firsthand as he did. So what's the relevance of it? And if everybody knew the dog had bitten someone and the man authorized euthanasia, my question still is why wasn't it reasonable to proceed? Well, the issue is he didn't authorize euthanasia. And that's the problem that we have at the district court is that there is a myriad of evidence about who said what, what everybody's assumptions were, and what they understood that document to be. Because even people who worked at St. Louis County understood that that document is filled out in every single bite case. They fill out all three of those boxes in every single bite case. Did they have them sign every single line? Accordingly. And what was the reason for that? If, in fact, this is a form that is used across the board, whether or not you're seeking euthanasia immediately, later, or just waiting out the 10-day quarantine, was there testimony in the record about why there aren't separate forms for that? Or, at a minimum, why you aren't signing only certain boxes within the one form? I don't recall anything in the record that indicates that specifically. I wasn't involved in the depositions themselves, so I don't recall that. Have you read the depositions? I'm sorry? Have you read the depositions? I read the depositions, yes. I don't recall seeing anything about that in the depositions with regard to the rationale behind having one omnibus form. I could presume that it's for efficiency to make sure that there's only one form that people have to use. Well, I guess I'm trying to get at the fact dispute, I think, that you're raising, which is really what is the meaning of the form? Why did they have him sign everything? What was the conversation? I'm not trying to put words in your mouth, but my understanding is that he's saying there were conversations. Well, he says he didn't talk to Rainwater, but there was Hawkins. He was saying, yeah, come and see Daisy tomorrow. Here are the visiting hours. So I guess I'm just trying to figure out how to put those two things together and how do you look at that form? He did sign it, and frankly, there's not a lot of words on it. And the words that are there pretty expressly say what Judge Colleton was describing. And I understand and agree with that. I think part of the problem is that the surrender or the quarantine is required by law. It's required by state law, and there's an ordinance passed by St. Louis County specifically about this. Mr. Ney signed the form because he had to sign the form, in fact, in deposition. Why couldn't he say, I've read that form. I don't want to sign it because I don't want the dog to use it. Failing to cooperate with animal control under the St. Louis County ordinances in a bite case is up to a one-year in jail and $1,000 fine. Mr. Ney was just doing what he and his wife thought they were supposed to do, and that was bring the dog to animal control for a quarantine. He signed what was put in front of him for the quarantine. He was explained the process, as Your Honor mentioned, for a quarantine. You're saying if he had refused to sign that section about euthanizing the dog, he was subject to a year in prison? The deposition testimony from Hawkins and I believe Ms. Duras is that everybody has to sign that form. You cannot quarantine a dog at St. Louis County without signing all three of those boxes. That's illogical. What testimony would support that? It's in the testimony that we cited, too, in the brief. It's by Hawkins. Actually, I believe I can. You may have to sign the form authorizing the people to take custody of the dog, but you don't have to sign to euthanize the dog to comply with the 10-day rule. That would be my argument as well, is that you shouldn't be signing three boxes. You should sign the specific box. Did she testify? Are you representing that she testified that in order to have a 10-day quarantine, you must sign the document authorizing us to euthanize the dog? The testimony that was cited in, I believe, the deposition excerpts were in our addendum to the brief by Ms. Hawkins that specifically says, every bite case has to sign this form, and when I believe Ms. Duras – Well, you're saying sign this form, but the form doesn't necessarily require you to sign the euthanasia section. The representation from Ms. Duras, I believe, indicates that it does. When she was asked, do they have to sign the entirety of the form, everybody has to fill this form out. She said, yes, they do. And nobody followed up to say why? Not that I'm aware of, no. I don't recall seeing anything in the record about the why. I'm not even sure about your – You keep saying they have to fill out the form. That's different from saying you have to sign everything on the form. When Mr. May has presented the form with X's next to it that say, this is where you need to sign, we can hold his feet to the fire and say he should have read every single thing, but considering the content of the conversations that were had, again, judging the reasonableness of this, what were the content of those conversations? Part of the problem is there is a material dispute as to the content of these various conversations and what representations were made and what Mr. May's understanding was, because he testified that he didn't understand it at that time, to be an immediate euthanasia. I mean, what strikes me about this case is it seems as though you had some good state law claims here, and you messed it up. You brought it in the federal court and threw out so many of these Fourth Amendment issues that don't fly, frankly, that the district court threw its hands up and declined to exercise supplemental jurisdiction. And that wasn't the court's fault. No, and I'm not arguing anything about the supplemental jurisdiction. Has the statute of limitations run? I'd have to look and see. I'm not quite certain, Your Honor. You don't know? I wasn't involved under the trial side of this case, so I'd have to look at the dates for sure to see. I don't believe that it has, though. If it hadn't run, that state case should have been filed the next day. The state case, I believe, has been filed. I'd have to check with my co-counsel and see, Your Honor. So we're just wheel-spinning here. Well, no, Your Honor, I beg to disagree that we're spinning. No, I know why we're here, 1242 U.S.C. Section 1988. Right. If I may reserve the last 15 seconds of my time. Thank you. Mr. Ward? Thank you, Your Honor. I'm William McGarry. I'm representing Rebecca Wainwater, Mary Ann Willis, Vanessa Durris, Miss Hawkins, and St. Louis County. I will be reserving time for Mr. Ward. You're going to have to speak up. I'm sorry. I'll be reserving time for Mr. Ward to argue on behalf of Dr. Wagenknecht. Appellant in her argument ignores one basic fact, that her and her husband had equal property rights in Daisy. There's no question, as you'll see in her briefs, that they were married under Missouri state law, which means sort of an exception, they each had an ownership right in Daisy, which means that Mr. Ney had a right to relinquish Daisy to the control of animal care and control. It's evident the court is familiar with the facts of this case, but, you know, I'll go through them briefly. Daisy was adopted as a family dog, purchased by Miss Bolfin and Mr. Ney. They took the dog home. The dog viciously bits. Are you going to spend time with the facts? No, Your Honor, I'll move on. This court held in Andrews v. City of West Branch the dog is considered property for Fourth Amendment purposes. It is also established in Andrews that there is no seizure if an owner relinquishes their property rights. This court found in McCoy v. City of Monticello that to establish a prima facie case, both of them must show that a seizure of property actually occurred. In this case, the district court found that it is undisputed that her husband, Mr. Edwin Ney, were married at the time they obtained Daisy, to that Daisy was purchased from funds from a joint checking account. Bolfin and Mr. Ney lived together at the time of purchase, and for Daisy was brought home to live with them as the family pet. There is no dispute that Bolfin's husband, Mr. Ney. Counsel, we've read your briefs. Why don't you respond to opposing counsel's argument this morning? Okay. As the court has touched on, there's been a lot of time spent on the forms that were signed by Mr. Ney. Mr. Ney, and I won't touch on the facts too much, but after the dog bit their daughter, Ms. Bolfin called her vet and asked, what should we do? Including, what do we want to do if we want to euthanize Daisy? That's undisputed. That is undisputed. That is in the deposition testimony from Ms. Bolfin. It also is undisputed, based on Ms. Bolfin's testimony, that the vet then said, well, we can't do anything right now, but we need you to call Animal Care Control and talk to them, especially if you want to euthanize the dog. Ms. Bolfin called, talked to Ms. Rainwater, and they went through the process, including asking Ms. Rainwater what do we want to do if we want to euthanize the dog. At that time, Ms. Bolfin authorized Mr. Ney to bring the dog in, Daisy the next day. Can I ask you just a procedural thing, which is, I think, relevant to the request or failure to request euthanasia? The record shows, then, that the veterinarian said, I cannot, in a bite case, proceed with euthanasia that has to be sort of recorded through Animal Control. Is that the reasoning for that? Yes, Your Honor, it's a process outstanding by statute and ordinance. Because of the bite? Correct. Thank you. Correct. And so Mr. Ney was authorized to bring the dog in the next day and sign all the appropriate paperwork, including if they wished to euthanize the dog. When Mr. Ney came in with Daisy, he was walked through a process, and as you'll see from the record, there were several of our, several named defendants who sort of took part in that process that ultimately led to Daisy's euthanasia. The appellees checked her identity, talked to Mr. Ney, informed him that he had to sign the form, and as you've seen from the record, the form has to be signed in three separate places, not just to release control to Animal Care and Control, but to also euthanize. So you agree with the representation that anybody who drops off a dog to Animal Control in a bite case has to sign the same form and has to sign every box that asks for their signature? Yes, Your Honor, and because appellate is arguing that Mr. Ney, essentially that he didn't know what he was signing. But again, you have to sign in three separate places. Well, if you're now saying the county requires you to sign all three boxes. No, Your Honor, I'm not saying all three. Well, you just said yes to Judge Kelly. I apologize, I misstated. For instance, if Mr. Ney was authorized by Ms. Bolton to sign the entire form, including for an up-to authorizing euthanasia, and that's what he did, and he did it witnessed by our defendants. So you're now saying that the person has the option whether to sign the boxes? Only on the euthanasia for sure. The person has the option whether or not to sign about euthanasia? Yes, Your Honor. Because if Mr. Ney at that time. . . Does the person have the option to sign that no person has been bitten? If he had knowledge of it, yes. But your witness, Hawkins, testified she was trained, as I understand it here, to have everybody sign the place that says no person has been bitten, even when there was a bite. I don't understand your question, Your Honor. In this case, the dog had bitten the child. Yes, but the daughter. And the form says, to my knowledge, no person has been bitten by the dog in the last 10 days. Correct. But everybody knew the dog had bitten the dog. Well, correct. So why is the city training their staff to have the owner sign a false statement? Well, let me take a step back. If the dog had bitten without Mr. Ney and Ms. Bolton relinquishing control, then there would have been a 10-day hold and they would have gone through that process. But in this instance, since Mr. Ney and Ms. Bolton were authorizing the turnover of the dog and the euthanasia, that's why the situation is a little bit different. There is no. . . But why don't you want to answer. . . I know why you don't want to answer the question, but is there an answer to why the staff is trained to have people sign a false statement that no person has been bitten? Your Honor, I believe Ms. Hawkins may have just been mistaken. Pardon me? She may have just been mistaken. About what? About how to fill out the form. Now, who testified that the person bringing the dog in has the option not to sign the euthanasia form? Tell me where to read that in the record so it's undisputed. Well, all of the appellees testified in the record that. . . Who? Come on. I haven't read them. I believe Ms. Rainwater, Ms. Hawkins, Ms. Duress testified. Testified what? Yeah, they were all asked that question, the question that Judge Colleton has been pressing on. You mean there's an option not to sign the euthanasia form, and you said yes, and I'm saying. . . The form. . . Give me the testimony to read to confirm that. I believe it would be Ms. Duress and Ms. Rainwater's testimony, Your Honor.  I don't know, Your Honor. Do you have a summary of it? Can you tell us why you believe that testimony? Well, take a step back. The process here would have been different if we had to. For instance, there was a dog bite, and we had to seize the dog. That's not what happened here. In this case, there was a dog bite. It was vicious. They called. . . They inquired of the euthanasia, and therefore Mr. Ney signed on three separate places on the form, not just to relinquish control of the dog, but also for it to euthanize. Appellant's argument is that he was just sort of befuddled by the form and didn't understand that he wasn't just releasing control, but he was also releasing for euthanasia. And he. . . And we. . . You know, we testified that Ms. Bolfin had a lengthy conversation with Ms. Rainwater about what was going to happen when Mr. Ney brought that dog in the next day. And so we are. . . You know, Mr. Ney was. . . We're under the. . . You know, our argument is that Mr. Ney knew that when he brought that dog in, among other things, he'd be signing it over to be euthanized. And yet there was. . . Wasn't there testimony to that he. . . And I. . . I think that Hawkins confirmed this, that they talked about visiting days for. . . Visiting hours over the next 10 days. And on the. . . On the form, it actually has an end date for the quarantine. Yes, Your Honor. For instance, if we had. . . If there was a dog by the dog that was reported and we had to seize the dog, there's a 10-day hold to watch the dog in case there's a rabies issue. That's just. . . But what about the conversations with Hawkins? I guess I'm just wondering, is there a fact dispute here about this consent that you're. . . You're firmly saying was given? No. No, Your Honor. We think there's no fact dispute regardless of whether there was a misintroduction of the form. If. . . If. . . If Ms. Bolton went through the process of calling her vet, the vet told her to call us. She had a talk with Ms. Rainwater. She authorized Mr. Ney to sign paperwork including up to euthanasia. Mr. Ney brought the dog in the next day. Had to sign the form and review it in three separate places. Our defendant. . . There is no dispute. We had our defendant witness him look at the paper and sign it and review it. So our argument would be that he knew he was signing the dog over to be euthanized. And therefore, there's no question of, you know, we weren't going to hold the dog for 10 days. We started the process. What about the fact that Ms. Bolton shows up the next day expecting to take Daisy home? At the end of the day, Your Honor, we briefed. . . We briefed this in our brief that we honestly think there was some. . . and not a misunderstanding between what was conveyed to us and Ms. Rainwater eventually conveyed to the defendants the day the dog was taken control of. And again, I'll go back to Mr. Ney, regardless of the Fourth Amendment argument or any other argument, had complete authority to turn that dog over to ACC regardless of Ms. Bolton's separate property right. They were both owners of the dog, Mr. Ney. And we had, you know, an argument in the briefs too is we acted reasonably in determining that Mr. Ney, when he came in with the dog after the previous conversation with Ms. Bolton, had the authority to not only turn over the dog but authorize euthanasia. And as he filled out the form, and I believe was reviewed the form, signed in three different places that he was able to turn that dog over for euthanasia. The one concern I have is whether there's evidence that the county had people sign this form in all cases, even when there was no intent for euthanasia. Is there evidence of that? Because if there were evidence of that, it would raise a question whether they reasonably relied on the form as grounds to euthanize. Your Honor, I'll refer back to not only my brief, but also the district court file. The district court did a very lengthy review of the record, including other dogs that might have been euthanized, and they didn't find any issue where there was a misunderstanding of the form. I think it was like five in 1,400 dogs somehow were euthanized under this situation. So the district court already did a very distinct analysis of the numbers based on what's in the record. Wasn't there some problem with the form, though, that was raised previously? Maybe the assertion has been corrected, but there was a problem with a misunderstanding of what people were actually authorizing when they dropped the form. And yes, Your Honor, and the district court did find that, but they found at the time this actually occurred there was no longer an issue with the form and it had been remedied. What was changed about the form to remedy the supposed problem? Well, as the district court found, he believed objectively that the form He didn't make findings. This was summary judgment. Right. He found that the form before He didn't make findings. You keep saying he found it. Sorry. Go ahead. The form could have been misleading in the past, but at the time that Mr. Ney signed it, it was much clearer and easier to understand. Is there anything in the record showing the change in the form? In other words, can we look in the record and see the old form and the new form? Your Honor, I can't answer that question. I apologize. At this time, may I turn it over to my colleague? So they improved the form by adding, no, the dog hasn't bitten anyone in 10 days? Yes, and to make it more clear that as you're going through the process, that if you're going to euthanize a dog, it is very distinct from just turning over its control. For instance, if you turn your dog for control, they can put the dog out if it clears to put it out for adoption. They made it much clearer in three separate places. How can they make it clearer and keep the false recitation? I don't understand. They kept in the form that no person has been bitten in the last 10 days. So they're having people sign a form after a dog bite that says no person has been bitten.  Well, I mean, there may be no good answer to that. At this time, may I turn it over to my colleague? Good morning. May it please the Court, my name is Mike Ward. I'm present on behalf of Dr. Philip Wagenknecht. I'll just be very brief. The United States Supreme Court has held that qualified immunity protects all but the plainly incompetent and those who knowingly violate the law. Dr. Wagenknecht did not do so. He must be judged, as the district court did, under the proper standard by his own personal conduct. And he's liable based on his conduct. In this case, there's no showing by the plaintiff that Dr. Wagenknecht would have known that he was violating Mrs. Bolfin's rights when he acted upon the supervisor's instructions and reliance upon those instructions to euthanize the dog. There's simply no showing that Dr. Wagenknecht acted unreasonably under the circumstances. He was simply performing his professional expertise as a veterinarian to euthanize the dog per the instructions of his supervisor. He had no reason to know about the intake forms. He was not involved with the intake forms. As I review the intake forms, he's not involved or engaged to second-guess the intake forms. He simply performs the procedure that he was asked to perform in this case. And for that reason, Your Honors, I respectfully request the court to affirm the district court's judgment for Dr. Wagenknecht. He simply did not act unreasonably under the circumstances. Thank you. Thank you. For rebuttal? Give him a minute and a half. I appreciate it. Thank you, Your Honor. As opposing counsel just spoke about with regard to Dr. Wagenknecht, one thing that's very interesting about Dr. Wagenknecht's responsive brief is that even he acknowledges that the Supreme Court has not taken hold of any particular cases with regard to whether there is a consent to seize. And again, I know some of the judges and I may disagree as to that position. However, it's very, very important because of the fact that Dr. Wagenknecht is in a bit of a different situation than the rest of the individual defendants. He's the one who ultimately did put a needle in Daisy and put her down. He admitted that he did not review the documents. He didn't compare anything. He just took a last-minute euthanasia and put a needle in the dog and put her down with no concern or question as to whether or not it was the correct dog. He left that up to somebody else. At its base, Your Honors, this case really kind of comes down to the fact that my client was attempting to do what she was obligated to do under the law. She was attempting to quarantine her dog. This, for whatever reason, got all out of whack. And as a result, Ms. Bolton was deprived of her property under the Fourth Amendment. For these reasons, we request that this Court reverse and remand. Thank you. Thank you, Counsel. The case has been thoroughly briefed and the argument has been helpful. We'll take it under advisement. The Court will be in recess for about 10 minutes.